AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

MAY 05 2017

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

LG E970 Optimus G cellular telephone bearing serial number 303KPFX146603

Case No. 17MJ1349

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2.

located in the Southern District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 8, United States Code, Section 1111(b) | Murder |

The application is based on these facts:
See attached Affidavit of NCIS Special Agent Jeff Kierman in Support of Search Warrant, which is incorporated herein by reference

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: ____________) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Jeff Kierman, Special Agent, NCIS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/5/17

[signature]
*Judge's signature*

City and state: San Diego, California

Karen S. Crawford
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Jeffrey T. Kierman, upon being duly sworn do hereby state that the following is true to my knowledge and belief:

1. I have been employed as a Special Agent ("SA") for the United States Naval Criminal Investigation Service ("NCIS") for approximately eleven years. I have a Bachelor of Arts degree in Criminal Justice from the University of Massachusetts at Lowell. I have a Masters of Forensic Science degree from National University. I am a graduate of the Criminal Investigator Training Program and the Special Agent Basic Training Program at the Federal Law Enforcement Training Center ("FLETC"), Glynco, Georgia. I have received advanced trainings in forensic techniques, bloodstain pattern analysis, crime scene reconstruction, and death investigations. I am a certified Tier II Crime Scene Analyst with the International Association for Identification ("IAI") and I am a diplomate medicolegal death investigator ("MDI") with the American Board of Medicolegal Death Investigators ("ABMDI"). I have been conducting federal, state and military criminal investigations for more than 11 years to include numerous cases involving six active homicide investigations, four cold case homicide investigations, sexual assault, aggravated assault, domestic violence, sexual assault, child molestation, burglary, larceny, conspiracy, and various other criminal enterprises. I have become familiar with the manner and means by which criminals commit and cover up violent offenses, and the places in which evidence of such crimes can be located. I have prepared and participated in the execution of numerous search warrants relating to violations of federal, state and military laws and have received training regarding the collection and preservation of digital evidence on electronic devices.

2. Based on the investigation and facts stated herein, I believe that there is probable cause to believe that fruit, instrumentalities, and evidence of the murder of Imelda OPPELT ("I.O."), in violation of Title 18, United States Code § 1111(b), will be found on the following electronic devices:

a. The Samsung SGH-i747 Galaxy SIII cellular telephone bearing serial number R31D41M0CPZ and assigned telephone number (808) 554-2747, seized on September 13, 2013 from a residence previously occupied by David Roneld OPPELT ("OPPELT") and I.O. OPPELT is the husband of I.O. The cellular telephone ("**Subject Telephone 1**") was primarily used by OPPELT and is further described in Attachment "A-1."

b. The LG E970 Optimus G cellular telephone bearing serial number 303KPFX146603 and assigned phone number (808) 722-5890, seized on September 13, 2013 from the OPPELT residence. The cellular telephone ("**Subject Telephone 2**") was primarily used by I.O. and is further described in Attachment "A-2."

c. The LG GSM GU292 cellular telephone bearing serial number 07KPED085188 and assigned cellular telephone number (808) 369-4533, seized on September 13, 2013 from the OPPELT residence. The cellular telephone ("**Subject Telephone 3**") was primarily used by nine-year-old Heather OPPELT ("H.O."), daughter of OPPELT and I.O., though call logs and recorded telephone calls placed to the Camp Pendleton Provost Marshall's Office ("PMO") reveal **Subject Telephone 3** was occasionally used by OPPELT as well. **Subject Telephone 3** is further described in Attachment "A-3."[1]

3. This affidavit is based upon information I have gained through training and experience, as well as upon information related to me by other individuals, including law enforcement officers. Since this affidavit is being submitted for the limited purpose of

[1] On September 13, 2013, the United States obtained authorization to search the OPPELT residence, located at 258 Laraway Street, Camp Pendleton, California 92055, from the Honorable David H. Bartick, U.S. Magistrate for the Southern District of California. The warrant authorized the United States to search for evidence relating to violations under Title 18, U.S.C. § 1111(b) (Murder). **Subject Telephones 1**, **2**, and **3** (referred to collectively hereinafter as "**Subject Telephones**") were seized pursuant to the authorization to search the OPPELT above-referenced residence.

securing a search warrant, I have not included each and every fact known concerning this investigation, but have set forth only the facts that I believe are necessary to establish probable cause for an order authorizing the requested warrant, which, as set forth below, seeks the authority to search the three cellular telephones for all items described in Attachment B, which I believe contain evidence relating to violations under Title 18, U.S.C. § 1111(b), the murder of I.O.

FACTS ESTABLISHING PROBABLE CAUSE

4. On September 12, 2013, I.O. was discovered deceased in her residence located on Camp Pendleton, 258 Laraway Street, MCB, CPC. OPPELT, I.O.'s husband, reported he discovered I.O. in the bathroom hanging from the shower rod with a blow dryer cord wrapped around her neck.

5. On September 12, 2013, NCIS interviewed OPPELT. OPPELT stated he woke that day at 6:00 am and I.O. and H.O. left the house at approximately 8:00 am. OPPELT indicated he was at home all day using the internet and watching television until I.O. and H.O. returned from work and school at approximately 3:00 p.m. OPPELT reported that he and I.O. subsequently got into an argument in the laundry room of their home about how they were going cook pork chops they planned to have for dinner that night. OPPELT informed NCIS that the argument did not become physical. OPPELT reported that after the argument, I.O. went upstairs to take a shower and OPPELT remained downstairs where he helped H.O. with her homework. While downstairs, OPPELT said that he also talked on the telephone with his father, and smoked several cigarettes outside the residence. OPPELT explained that approximately an hour later, he went upstairs to check on I.O. and found her in the bathroom hanging from the shower rod with a blow dryer cord wrapped around her neck.

6. On September 12, 2013, MCPD Officer Vincent GIAMBRONE, arrived at the OPPELT residence in response to a 911 call. GIAMBRONE stated that upon his arrival, OPPELT told GIAMBRONE that he and I.O. had an argument about her having

an affair with someone in her unit just before she died. This confirmed H.O.'s description of the argument, but contradicted what OPPELT told NCIS hours later.

7. On September 12, 2013, H.O. was forensically interviewed at Palomar Forensic Health Services and stated she overheard some of her parents' argument in the laundry room while doing her homework in the kitchen as the laundry room is adjacent to the kitchen. H.O. indicated the fight was over I.O.'s alleged infidelity, which contradicted OPPELT's statement about pork chops. During the argument, H.O. heard a loud noise, and then saw a box of powder and a sock fall to the floor of the laundry room.[2] H.O. reported that after her parent's argument, I.O. went upstairs to her bedroom but then came back downstairs and grabbed a knife from the kitchen counter and went back upstairs. H.O. stated that when OPPELT saw I.O. grab the knife he said "I don't really care. You can take that up." H.O. reported she later heard three loud banging noises from the upstairs bathroom. When H.O. heard the noises, OPPELT was not in the kitchen with her and she could not see him downstairs. According to H.O., sometime after the banging noises she heard her father yelling for her from the upstairs. H.O. said she went upstairs and saw OPPELT carrying I.O. by the neck and waist from the bathtub.

8. In their respective interviews, OPPELT and H.O. also provided background on OPPELT's relationship with I.O. and their family. OPPELT informed NCIS that he was aware I.O. had an affair when they lived in Hawaii and suspected I.O. was still having an affair with a man from her unit. OPPELT stated to NCIS that after the first affair, he installed an application ("App") on I.O.'s cellular telephone, so he could activate the speaker on her cellular telephone remotely to hear whether or not I.O. was doing what she was supposed to be doing. H.O. stated her father had played several audio recordings for her that proved I.O. was having an affair.

9. OPPELT admitted he was angry at I.O. and that one time he told H.O. he was

---

[2] The subsequent search of the residence confirmed several items appeared to have fallen from shelves and remained on the floor in the laundry room.

tearing up I.O.'s clothing because he was mad, but told NCIS the clothing was actually old shirts he was going to use to clean his car. H.O. told her forensic interviewer she and OPPELT tore up I.O.'s clothes, smashed her glasses and kicked her out of "their" house because I.O. was a liar. OPPELT explained H.O. knew he was mad at I.O. for the affairs, and H.O. knew her mother was habitual liar.

10. OPPELT stated he, I.O. and H.O. all sleep in a bedroom downstairs together because it is cooler downstairs. H.O. stated that she and her father sleep in a bed downstairs together while her mother sleeps upstairs.

11. On September 13, 2013, a death scene examination ("DSE") was conducted at the OPPELT residence pursuant to a search warrant issued by the Honorable David H. Bartick, a U.S. Magistrate Judge in the Southern District of California, wherein multiple items of evidence were seized, including, but not limited to a Toshiba Laptop, one Kindle Tablet, one Government-issued Dell Laptop computer issued to I.O. by her command and three cellular telephones (**Subject Telephones 1, 2,** and **3**). Also seized were a butcher knife and a ceremonial sword that were found next to the bathtub where I.O. was allegedly discovered hanging. Additionally, a handwritten note found in I.O.'s jeans pocket was seized. The jeans were on the toilet seat next to where I.O. was reportedly found hanging. The note had a list on it that read, "self worth, childhood trauma, grief and loss, anxiety, depression, sexual molestation." During OPPELT's interview, he described I.O. writing a similar note that she carried with her as evidence of her psychological problems.[3]

12. Additionally, during the DSE, evidence of a physical altercation was observed in the laundry room, contrary to OPPELT's claim that his argument with I.O. was only verbal. In the laundry room where the argument and subsequent altercation occurred, a notebook containing documentation of I.O.'s Service Members' Group Life

[3] The seized note was submitted for forensic analysis. On November 5, 2013, the United States Army Criminal Investigative Laboratory ("USACIL") reported the note was "probably not" written by I.O. based on the known writing samples available for I.O. Additionally, on November 8, 2013, USACIL reported three latent fingerprints were developed on the note. None of the three latent fingerprints from the note matched fingerprints for I.O. OPPELT's fingerprints are not on file and the fingerprints from the note have yet to be identified.

Insurance ("SGLI") was discovered. OPPELT was listed as the sole beneficiary and would receive a lump sum payment subsequent to I.O.'s death.[4]

13. On September 13, 2013, an autopsy was conducted at the Naval Medical Center San Diego ("NMCSD"). The Armed Forces Medical Examiner System ("AFMES") ruled the cause of death to be "Hanging" and the manner of death to be "Undetermined." Preliminary autopsy observations revealed I.O. had numerous injuries to include a subcutaneous hematoma in the top portion of the right lateral Parietal bone above I.O.'s ear. Examination of the anterior midline of the neck revealed I.O.'s left lateral Hyoid bone was broken. I.O. also had a thin lateral abrasion on her wrist.

14. Subsequent to I.O.'s death, investigative efforts and interviews were used to create a timeline of events leading to the death of I.O. Pertinent points in the timeline are described below.

a. On August 13, 2013, OPPELT called Marie FLORES, CIV. FLORES was a "close friend" of I.O. and the two previously worked together in Hawaii. OPPELT told FLORES that I.O. was having an affair. OPPELT complained that I.O.'s Army unit was disrespectful to both I.O. and him. During the telephone call, OPPELT was very angry and said he was going to expose I.O. to the world and show everyone what kind of person she really was. OPPELT indicated he had already gone to the police and the Judge Advocate General ("JAG") with his evidence. OPPELT indicated he "bugged" I.O.'s cellular telephone and computer.[5] OPPELT told FLORES that I.O. was never going to get custody of H.O. OPPELT said I.O. was never going to have any influence over H.O. again, and that H.O. was his daughter. FLORES

---

[4] One or about October 15, 2013 SGLI paid OPPELT $500,000 as the sole beneficiary of I.O.'s life insurance policy.

[5] During the investigation agents discovered that at least two tracking applications were placed on I.O.'s cellular telephone, **Subject Telephone 2**, that could remotely activate the microphone and camera and send location information to **Subject Telephone 1**.

told OPPELT she did not believe OPPELT, and OPPELT responded by saying, "you do not know Imelda well enough, you will see." On the same day, August 13, 2013, OPPELT sent text messages from **Subject Telephone 1** to I.O., using **Subject Telephone 2**, that told her not to come home.

b. On August 14, 2013, I.O. submitted her package to the Army to leave the Active Guard Reserve ("AGR") program and return to Hawaii. Numerous witnesses informed NCIS that OPPELT forced I.O. to submit her package to leave the AGR and that I.O. really did not want to leave the program. On August 18, 2013, OPPELT sent a Facebook Message to a contact named Proyalsz ALATASI-VERDUGO. OPPELT indicated he was not happy in California and that he made the military return his family back to Hawaii. Additionally, OPPELT referred to I.O. as "super stupid" in the conversation.

c. On September 10, 2013, at approximately 3:20 p.m., OPPELT sent I.O. a text message that read, "Don't come home, stay at work." At approximately 4:07 p.m., OPPELT sent I.O. another text message that said "the option is yours to come home I was mad." On September 11, 2013, at approximately 2:26 p.m., OPPELT sent I.O. a text message that read, "I don't think this would mean much, but I'm sorry if I hurt you last night."

d. On or about September 11, 2013, I.O. called the Childcare Resource and Referral Office, Marine Corps Base, Camp Pendleton, California's Children, Youth, and Teen Programs ("CYTP") division. CYTP records indicated I.O. requested an application to have I.O.'s daughter, H.O., placed on the waitlist to be enrolled in one of the Child

Development Centers. I.O. provided CYTP her email address - ioppelt@yahoo.com.[6]

15. On September 12, 2013, I.O. gave her supervisor, CW2 Marisol CHAVEZ, a sticky note and spoke with CHAVEZ about wanting a new schedule. I.O. usually stayed at work until 5:00 p.m., but was making a new request to work from home after 2:45 p.m. on Mondays, Tuesdays, Thursdays, and Fridays and after 12:15 p.m. on Wednesdays, so she could pick H.O. up from school. CHAVEZ felt this was odd because OPPELT was unemployed and usually picked H.O. up from school.

16. NCIS conducted a cursory search of OPPELT, I.O. and H.O.'s cellular telephones, **Subject Telephones 1**, **2**, and **3**, using a Cellebrite Universal Forensic Extraction Device ("UFED"). The search was conducted pursuant to a Permissive Authorization for Search and Seizure granted by OPPELT on September 13, 2013. The UFED allows for an investigator to extract and review portions of the data stored on a cellular telephone. Numerous email addresses were discovered on all of the **Subject Telephones**. Additionally, applications for Facebook Messenger and Google Talk were also discovered on OPPELT's telephone, **Subject Telephone 1**. The application for Google Talk was also discovered on I.O.'s cellular telephone, **Subject Telephone 2**. These applications and services can be accessed from either a cellular telephone or a computer. OPPELT's cellular telephone, **Subject Telephone 1**, contained approximately 4600 audio files of recordings he had made using the application that could remotely activate the speaker on I.O's cellular telephone, **Subject Telephone 2**. The cursory examination of **Subject Telephone 1**, revealed images created from an application that could remotely prompt the camera on I.O.'s cellular telephone, **Subject Telephone 2**, to take a photograph of the surroundings. **Subject Telephone 1** also contained over 100 text

---

[6] During the investigation, OPPELT stated to NCIS he had access to I.O.'s cellular telephone and computer, so there is a high probability that OPPELT saw I.O.'s email to CYTP. If so, OPPELT would have learned that I.O. was planning to stay in California and arrange for daycare for H.O. notwithstanding OPPELT's belief that his family was moving to Hawaii where OPPELT would continue to be a stay-at-home dad for H.O. Based on the timing of I.O.'s email to CYTP, this realization would have occurred within one day of I.O.'s death.

message notifications stored on the device that tracked the location of **Subject Telephone 2** throughout the months leading to I.O.'s death.

17. NCIS agents commenced the cursory examinations of **Subject Telephones 1, 2,** and **3** on or about September 16, 2013. Since then, additional investigative questions have been raised that could not have reasonably been foreseen at the time of that examination. OPPELT and H.O. were both interviewed on September 12, 2013. At that time, OPPELT informed NCIS agents that he was home the entire day of I.O.'s death, however, H.O. told NCIS agents that OPPELT was not home when she and I.O. returned home from school. It was not known in the early stages of the investigation that this discrepancy would be of investigative relevance, so no attempt was made to "geolocate" **Subject Telephone 1** for the date of September 12, 2013. Based on my training, experience and discussions with trained computer forensic technicians, I am aware it is possible that geolocations and Global Positioning System ("GPS") data stored on the **Subject Telephone 1** may provide evidence as to OPPELT's whereabouts in the hours leading up to his wife's death.

18. Also, a forensic review of I.O.'s government-issued laptop[7] revealed that on August 14, 2013, I.O. searched for resources pertaining to domestic violence. A review of the photographs stored on **Subject Telephone 2** revealed what appeared to be photographs saved after I.O. took photographs of bruises on her legs. Based on my training, experience and discussions with trained computer forensic technicians, I am aware that "metadata" is stored with photographs taken using cellular telephones that may include the date of, and the GPS location where, the photograph was taken.

19. A review of **Subject Telephone 1** revealed that OPPELT installed an application that automatically deleted his search history every day. Based on my training, experience and discussions with trained computer forensic technicians I am aware that his

[7] On September 13, 2013, the Honorable David H. Bartick, U.S. Magistrate for the Southern District of California, signed a search warrant authorizing the search of I.O.'s government-issued laptop.

search history would not be retrievable using the means originally used to review **Subject Telephone 1**, but that the advanced techniques and equipment used by a computer forensic technician may be able to retrieve that deleted data.

20. During this investigation it was revealed that the cellular telephone commonly used by H.O., **Subject Telephone 3**, was used to call the Marine Corps Police Department ("MCPD") Non-Emergency number on July 20, 2013. MCPD provided NCIS a recording of the call originated from **Subject Telephone 3**, which revealed a male identifying himself as David OPPELT called MCPD to report that his wife, identified as I.O., was having an adulterous affair with someone from her command. MCPD advised OPPELT to address the issue with his wife's command. This recorded telephone call to MCPD indicates OPPELT used **Subject Telephone 3** just a couple of months before I.O.'s death to discuss matters pertaining to I.O. and OPPELT's suspicions of I.O.'s infidelity.

21. Additionally, since 2013, the techniques and equipment used to search and analyze data stored on cellular telephones and electronic storage devices has become more advanced and effective. Since the consensual search of **Subject Telephones 1**, **2**, and **3**, the **Subject Telephones** have been safely secured in evidence storage with no way to remotely access, alter, or destroy any of the data that has been stored on the devices since their initial seizure. Based on my training, experience and discussions with trained computer forensic technicians I have complete reason to believe that any data that was on the devices on that day will still be stored on the devices and an additional, more advanced analysis of the cellular phones will yield additional evidence.

## SEALING OF THE AFFIDAVIT, APPLICATION, WARRANT AND INVENTORY

22. It is further respectfully requested that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant, and the requisite inventory notice. Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation and premature disclosure of the contents of this affidavit and related

documents may have a negative impact on this continuing investigation and may jeopardize its effectiveness.

PROCEDURES FOR ELECTRONICALLY-STORED INFORMATION

23. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

25. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## CONCLUSION

26. Based on the foregoing, I believe there is probable cause to believe the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of Title 18, U.S.C. § 1111(b) (Murder) and will be found on the property to be searched as provided in Attachments A1-A3.

Jeffrey T. Kierman, Special Agent
United States Naval Criminal
Investigation Service

Subscribed and sworn to before me
this 5th day of May, 2017.

Honorable Karen S. Crawford
United States Magistrate Judge

## ATTACHMENT A-2

One LG E970 Optimus G cellular telephone bearing serial number 303KPFX146603 and assigned phone number (808) 722-5890 ("**Subject Telephone 2**").

Cellular telephone is currently located at NCIS Marine Corps West Evidence Log number 1042-13 Item A.

# ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization is sought to search for and seize evidence that relates to the violations of Title 18, U.S.C. § 1111(b) (Murder). This authorization includes the search of physical documents and includes electronic data to include deleted data, remnant data and slack space. The seizure and search of computers and computer media will be conducted in accordance with the "Procedures For Electronically Stored Information" provided in the affidavit submitted in support of this warrant. Items to be seized include the following:

1. Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

    a. tending to indicate David OPPELT's efforts to plan and execute I.O's death; David OPPELT's efforts to track I.O.'s whereabouts leading up to I.O.'s death; David OPPELT's contact with I.O.'s command regarding I.O.'s alleged affair and David OPPELT's concerns about alleged criminal activity involved in I.O.'s command;

    b. tending to identify other facilities, storage devices, or services-such as email addresses, IP addresses, telephone numbers-that may contain electronic evidence tending to indicate David OPPELT's efforts to plan and execute I.O's death; David OPPELT's efforts to track I.O.'s whereabouts leading up to I.O.'s death; David OPPELT's contact with I.O.'s command regarding I.O.'s alleged affair and David OPPELT's concerns about alleged criminal activity involved in I.O.'s command;

    c. tending to identify co-conspirators, criminal associates, or others involved David OPPELT's efforts to plan and execute I.O's death; David OPPELT's efforts to track I.O.'s whereabouts leading up to I.O.'s death; David OPPELT's contact with I.O.'s command

regarding I.O.'s alleged affair and David OPPELT's concerns about alleged criminal activity involved in I.O.'s command;

d. tending to identify travel to or presence at locations connected to David OPPELT's efforts to plan and execute I.O's death; David OPPELT's efforts to track I.O.'s whereabouts leading up to I.O.'s death; David OPPELT's contact with I.O.'s command regarding I.O.'s alleged affair and David OPPELT's concerns about alleged criminal activity involved in I.O.'s command;

e. tending to identify the user of, or persons with control over or access to, the subject phone; and,

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.